1  PAUL J. DOMBECK, ESQ.
   Arizona State Bar No. 022418
2  THE LAW OFFICE OF PAUL J. DOMBECK, PLLC
   18444 N. 25th Ave., Ste 420
3  Phoenix, AZ 85023
   telephone (602) 648-2035
4  facsimile  1-866-648-2128
   paul.dombeck@azbar.org
5
   Attorney for Plaintiff
6

7              IN THE UNITED STATES DISTRICT COURT

8                     DISTRICT OF ARIZONA

9
   Anthony Fontana                    )
10                                     )
11              Plaintiff              )     No.
                                       )
12              v.                     )
13                                     )
                                       )     **COMPLAINT**
14                                     )
15 United of Omaha Life Insurance     )
   Company,                           )
16                                     )
17              Defendant.             )     _____
                                       )
18 _____

19         Comes now the Plaintiff, Anthony Fontana, and by his attorney, PAUL

20 J. DOMBECK, and complaining against the defendant, states:

21                  **JURISDICTION AND VENUE**

22                              I.

23

24         Jurisdiction of the court is based upon the Employee Retirement Income

25 Security Act of 1974 (ERISA); and in particular, 29 U.S.C.§§1132(e)(1) and 1132(f).

26 Those provisions give the district courts jurisdiction to hear civil actions brought to

27 recover benefits due under the terms of employee welfare benefit plans which, in this

28 case, consists of group short term and long term disability benefit plans to employees

of Scottsdale Healthcare Corp. ("SHC") set forth as Scottsdale Healthcare Corp, Group Short Term and Long Term Disability Plan ("Plans" or "Plan(s)" or "Plan") administered and/or adjudicated by Plan(s) Fiduciary, United of Omaha Life Insurance Company, and/or Mutual of Omaha ("United of Omaha"), provided by SHC to plaintiff Anthony Fontana, one of its employees.  In addition, this action may be brought before this Court pursuant to 28 U.S.C. §1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

II.

The ERISA statute provides, at 29 U.S.C.§1133, a mechanism for administrative or internal appeal of benefit denials.  Those avenues of appeal have been exhausted.

III.

Venue  is  proper  in  the  Phoenix  District  of  Arizona.  29 U.S.C.§§1132(e)(2), 28 U.S.C. §1391, ERISA § 502(e), because the "breach" of the subject disability benefit Plans occurred in Maricopa County, Arizona, and because defendant may be found in Maricopa County Arizona.

**NATURE OF ACTION**

IV.

This is a claim seeking an award to Plaintiff of disability income benefits pursuant to the aforereferenced subject Plans, said Plans designated in Plan Documents as Group Policy Number (GP) GUD-09P58 by United of Omaha, providing group Short Term Disability ("STD") and Long Term Disability ("LTD") benefits to employees of SHC; said Plans are provided by United of Omaha and administered by United of Omaha under group control numbers and/or policy numbers not limited to Plan Number GUD-09P58 and Claim Number 111810000301.

This action, seeking recovery of benefits, is brought pursuant to §502(a)(1)(B) of ERISA 29 U.S.C. §1132(a)(1)(B).

## THE PARTIES AND THE DISABILITY PLANS

### V.

That the Plaintiff is a resident of the County of Maricopa, State of Arizona, and has been at all times hereinafter stated.

### VI.

That the Plans, as described in the Plan(s) documents, are, upon information and belief, welfare benefit plans providing respectively Group Short Term Disability and Group Long Term Disability for employees of SHC.

### VII.

That Employer SHC is a Plan(s) fiduciary per 402(a) of ERISA, and upon information and belief, is an Arizona corporation licensed to and doing business in Arizona, and further that Defendant United of Omaha, is a Nebraska corporation licensed to and doing business in Arizona.

### VIII.

That SHC, is the LTD Plan(s) administrator, and maintains health care coverages that are funded through Plan Number GUD-09P58 and/or Claim Number 111810000301, issued by United of Omaha, and that claims upon said coverages are in actuality functionally administered and/or adjudicated by United of Omaha, and that SHC was at all times relevant the employer of Plaintiff Anthony Fontana.

### IX.

That as claims adjudicator, defendant United of Omaha reviews disability claims for the purpose of approving, adjusting, denying or issuing benefits, based

3

upon information that United of Omaha and SHC generate.

X.

That the Plaintiff, as an employee of SHC was eligible for certain employee benefits, including disability plans and policies, as per the terms and conditions of the written Plans, as outlined on Summary Plan Description brochures and/or Group Benefit Plan documents offered to, disseminated amongst and granted to employees of SHC, including but not limited to the benefits described as a Group Policy contract between United of Omaha as the Company and SHC, as a subscriber to the Plan number GUD-09P58 and Claim Number 111810000301. That Anthony Fontana elected and/or was provided benefit coverage paying 66 2/3% of monthly gross salary, and paid all premiums therefor as required.

XI.

At all times relevant hereto, the subject Plans constituted "employee welfare benefit plan(s)" as defined by 29 U.S.C. §1002(1); and incident to his employment, Anthony Fontana received coverage under the Plans as a "participant" as defined by 29 U.S.C. §1002(7). This claim relates to benefits under the foregoing Plans.

XII.

On or about October of 2007, Mr. Fontana began working for SHC, in Scottsdale, Arizona as a Sonographer Technician. His position required the claimant to work at the highest level of mental acuity to process images, and physical ability as required to assist patients in getting in and out of the sonography bed and prepare patients to obtain appropriate imaging as required and move heavy medical equipment.

///

4

## STATEMENT OF FACTS

### XIII.

At all appropriate times, Anthony Fontana was a full-time employee of SHC, and he was actively employed at SHC until on our about May 31, 2011 when he ceased working due to severe back pain. From May 31, 2011 until the present Anthony Fontana has not engaged in any substantial gainful activity.

### XIV.

On or around May 31, 2011, and while still maintaining status as a SHC employee, Plaintiff Anthony Fontana made a timely application under the subject Short Term Disability (STD) Plan, under claim number(s) not limited to 111810000301, stating that on or about May 31, 2011 he met the Plan(s) definitions of disability on account of medical conditions which rendered him unable to perform at least one of the material duties of his regular job on a part-time or full-time basis.

### XV.

Said medical conditions were specifically, severe chronic back pain due to spinal impairments requiring spinal surgical procedures and specifically resulting in failed spinal surgical procedures and the conditions, limitations and sequella therefrom, and for which the plaintiff supported his claim for LTD benefits with medical records and reports and other evidence certifying his disability.

### XVI.

Based upon this application and supporting evidence United of Omaha initially awarded the plaintiff STD benefits from May 31, 2011, and paid said benefits through, the maximum 90-day STD benefit payment duration limitation, contemporaneous with which the plaintiff also completed a timely application for LTD benefits and received LTD benefits from the defendant until August 21, 2014, a time period during which the United of Omaha subject STD and LTD Plans stated in

pertinent part the following "Own-Occupation" definition of disability: *"...because of an injury or sickness, a significant change in your mental or physical functional capacity has occurred in which you are prevented from performing at least one of the material duties of your regular job on a part-time or full-time basis".*

XVII.

The Subject LTD Plan disability-definition broadens after the first 24 months, stating in pertinent part: *"Disability and Disabled mean you are unable to perform all of the material duties of any gainful occupation."*

XVIII.

During the time-period of the LTD "own-occupation" standard, on or around September 3, 2013, the plaintiff was awarded Social Security Disability (SSDI) benefits retroactive to May 31, 2011.

XIX.

The SSDI disability definition ("*inability to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment" that is of "such severity that [the claimant] . . . cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives." See 42 U.S.C. § 423(d)(1)(A), (2)(A)")* is at least as strict as the broadest United of Omaha "Any Occupation" disability definition under the subject LTD Plan because the Social Security standard offers no definitional leniency for a claimant's past earnings or location, *See Montour v. Hartford 588 F3d. at 636; cf. DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d, 440, 446 (6th Cir. 2009)*

XX.

During the latter part of the subject LTD Plan's "own occupation" disability period, specifically on or around June of 2014, United of Omaha hired a

defense medical examination consultant (Jon D. Zoltan M.D.) to examine the Plaintiff and write a consultative opinion; and consultant Zoltan's opinion was that the plaintiff could sustain competitive work at the "light" exertional level.

XXI.

Also during this "own occupation" disability period, Defendant United of Omaha also conducted "sub-rosa" surveillance of the plaintiff's activities and movements, specifically recording observations of the plaintiff on or about the dates of September 10th thru 12th of 2013 and March 15th, 17th and 18th of 2014 and June 18th and 19th of 2014; and United of Omaha during all of this time continued to pay the benefits to the plaintiff until August 21, 2014.

XXII.

Prior to consultant-Zoltan's report, but also during this "own occupation" disability period, on or around September 11, 2013, Defendant United of Omaha also had hired a physical therapy practitioner to conduct a functional capacity examination (FCE) of the plaintiff, and upon information and belief United of Omaha did not provide this vendor with motion footage from the surveillance; this consultant's conclusion, in contrast to that of consultant Zoltan, was that the plaintiff could only sustain a "sedentary" exertional level work.

XXIII.

Shortly after United of Omaha's FCE vendor completed the report for United of Omaha concluding that the plaintiff could only sustain a "sedentary" exertional level, upon information and belief United of Omaha then sent this FCE vendor a copy of the actual motion footage of the surveillance; after viewing the motion footage, the FCE vendor sent United of Omaha a supplemental report concluding that the motion footage did not change the earlier conclusion that the plaintiff could only sustain a sedentary level of work.

XXIV.

By August 28, 2014, United of Omaha informed the plaintiff that pursuant to an alleged further review of Plaintiff's medical evidence, that the plaintiff's impairments and functional limitations supposedly no longer met the requisite definition of disability, which after the August 21, 2014 had broadened to the "any occupation" standard.

XV.

On or around September 5, 2014 the plaintiff, as yet unrepresented by counsel, asked United of Omaha, both over the phone and in writing, for a copy of the claim file and/or administrative record, and in response United of Omaha forwarded to the plaintiff some portions of the administrative record that did not include motion footage of the surveillance that United of Omaha and its consultants had cited in their reports, and had also cited in its August 28, 2014 denial of benefits, rather regarding the surveillance United of Omaha only provided the Plaintiff with a limited number of select still-photo type images taken from the footage.

XXVI.

Then on or around December 1, 2014 Plaintiff, through counsel, requested in writing (for the second time), pursuant to 29 U.S.C. §1132(c)(1), a copy of those portions of the administrative record that United of Omaha had not already provided to the plaintiff, and as part of this request specifically also requested that United of Omaha forward a copy of the 'full-motion' surveillance footage, specifically explaining to United of Omaha that said surveillance was referenced in United of Omaha's August 28, 2014 denial letter as well as in consultant Zoltan's report; Following this communication however United of Omaha still did not produce the motion footage nor otherwise respond to Plaintiff's request regarding the motion footage.

XXVII.

On or about February 24, 2015, Anthony Fontana submitted to Defendant United of Omaha in accordance with 29 U.S.C. § 1133 an administrative appeal of the August 28, 2014 denial of his LTD benefits.  In support of this appeal, Plaintiff Fontana submitted additional medical evidence from treating and examining physicians and vocational and other sources demonstrating substantially that his condition had not improved, and that his condition precluded him from performing any alternative occupation and thereby that at all relevant times he met and continued to meet the Plan(s)' requisite disability definitions.

XXVIII.

In this February 24, 2015 appeal, the Plaintiff (for the third time) also specifically reminded United of Omaha that on or around December 1, 2014 Plaintiff through counsel had requested United of Omaha forward a copy of the 'full-motion' copy of the surveillance footage referenced in United of Omaha's August 28, 2014 denial, and that to date United of Omaha had not forwarded copies of this footage, and thus the plaintiff had not been able to obtain comprehensive opinions from Mr. Fontana's physicians regarding the alleged exertions depicted in that motion footage; and Plaintiff also advised United of Omaha that to the extent that United of Omaha continued to rely for denial upon any of the motion-footage, United of Omaha's refusal to disclose that footage undermined the plaintiff's ability to understand and/or address issues arising from those images and consequently undermined the plaintiff's ability to demonstrate to United of Omaha that he continues to meet the requisite Plan definition, which in turn failed to afford to Plaintiff the 'full and fair review' contemplated by contemporary ERISA jurisprudence, *e.g., Harris v. Aetna Life Insurance Company, 379 F.Supp 2d 1366, 1371-1372.*

XXIX.

In his February 24, 2015 appeal Mr. Fontana also specifically advised

9

United of Omaha that it was apparent that United of Omaha had misconstrued at least the surveillance still-images that United of Omaha had provided, and also that it was unclear from all of United of Omaha's evidence, including consultative opinions and reports, whether United of Omaha's consultants had seen and relied upon motion footage from the surveillance and/or whether United of Omaha's consultants had only seen still-photo depictions of the surveillance footage.

XXX.

In his February 24, 2015 appeal the plaintiff also specifically advised United of Omaha that it was apparent that United of Omaha and its consultants had also failed to properly consider Mr. Fontana's spinal impairments, including documentary evidence of worsening pain with activity.

XXXI.

In his February 24, 2015 appeal Mr. Fontana also specifically referenced medical, vocational, and functional capacity examinations and reports all of which concluded and/or otherwise demonstrated that the claimant as a result of his conditions and functional limitations at all pertinent times could not sustain any type of competitive employment, and pursuant to which the plaintiff requested that United of Omaha reverse the August 28, 2014 denial and reinstate Mr. Fontana's LTD benefits.

XXXII.

In support of his February 24, 2015 appeal request, the plaintiff also specifically and in writing brought the defendant's attention to each of the following arguments and issues:

A) That from the opinions and conclusions expressed in Consultant Zoltan's June 19, 2014 report, it is apparent Zoltan viewed only 'stills' from the surveillance footage, and that the surveillance vendor did not observe any

activity suggesting an ability by this plaintiff to sustain full-time competitive work at any exertional level, and that the plaintiff was not observed doing anything inconsistent with his claimed limitations.

B) The written report of the September 10th -12th, 2013 surveillance allegedly depicted the plaintiff lifting a garbage bag and a box, but that since United of Omaha did not provide access to the motion-footage the plaintiff and his medical providers could not assess how heavy or large the bag and the box were.

C) United of Omaha's own consultative medical assessment was that the plaintiff was restricted from repeatedly lifting more than 10 lbs, yet the surveillance reports did not state that the plaintiff had repeatedly lifted more than 10 lbs.

D) United of Omaha's 2013 Functional Capacity examiner also concluded that the 2013 surveillance footage did not depict lifting above the 10-lbs limitation.

E) With the 'still' surveillance images provided by United of Omaha it was not possible to determine if the plaintiff was wincing or otherwise having difficulty lifting the alleged bag and/or box and/or for how long and over what distance(s) he lifted/carried them.

F) The 2013 surveillance report also did not depict consequential pain, discomfort or decompensation from those exertions, including whether the plaintiff had to rest or decompensate after the depicted activities.

G) That the 2013 surveillance report alleges the plaintiff was carrying a "medium sized dog", by which United of Omaha and/or its vendors and agents imply a dog of 25lbs, but that the Plaintiff owns only a 10-12 lbs "toy-breed" Pomeranian dog, and that this inaccuracy was compounded by consultant Zoltan referencing the surveillance report and proffering that because of the plaintiff's supposed ability to lift the "medium sized dog" described by the surveillance vendor, that the plaintiff's functional capacity is *inconsistent* with a September 11, 2013

functional capacity exam ordered by United of Omaha which concluded that this plaintiff cannot do anything more strenuous than *sedentary* work; and thus if Zoltan viewed the motion-footage (that United of Omaha still had not turned over to Plaintiff) he distorted the size of the dog, but alternatively if he viewed only stills, his conclusions were nevertheless based upon the surveillance vendor's distortion.

H) Consultant Zoltan's report contains other improper speculation, hearsay, distortions and wrong information including that:

i) Zoltan concludes the plaintiff can do light work substantially as a result of Zoltan's conclusion that the plaintiff can lift 10 lbs occasionally, but that Zoltan does not meaningfully consider other significant factors in evidence such as interruptions with work activities flowing from the plaintiff's requirement of lying down a significant portion of each day, and also Plaintiff's diminished concentration and attention because of chronic pain, and also the necessity for additional work-breaks.

ii) Zoltan also references and in pertinent part relies upon a vague statement from the 2013 Liberty Mutual Functional Capacity Evaluation that alleges the plaintiff was *'walking the dog a little more than indicated'*, yet fails to consider that the plaintiff's doctor told the plaintiff to walk as a form of home-exercise, particularly considering that neither the United of Omaha physical therapy FCE vendor nor consultant Zoltan explain what is meant by "more than indicated"; and that there is no indication Zoltan observed the plaintiff for the extended time-period necessary to establish this assertion, and that if there is some surveillance evidence establishing how long the plaintiff walks his dog, this has not been disclosed to the plaintiff.

iii) Zoltan reported that the plaintiff entered the examination room with

more normal gait, then displayed more abnormal gait during the examination and then (based upon the hearsay statement of an unidentified Zoltan employee) a more normal gait once again after the examination, yet declined to consider or acknowledge the effect upon the plaintiff of the time and exertions that the plaintiff was required to make as part of the examination.

iv) Zoltan's actual physical examination of the plaintiff showed tenderness at various levels of the plaintiff's spine and numbness on certain areas of the feet, yet Zoltan concludes that sensory tests are 'inconsistent' without explaining how or why that is the case or how the plaintiff would be expected to sustain employment in light of those symptoms.

v.) That United of Omaha asked Zoltan to focus more upon the 2013 surveillance with the result that there was scant mention of the latest (2014) surveillance in Zoltan's report, a report which indicated less exertional-type activity than the 2013 surveillance, and no exertions suggestive of a sustained sedentary work capacity.

vii) that consultant Zoltan's response to United of Omaha's question number 4 (regarding consistency of casual versus examination observations) appears to indiscriminately cobble together Zoltan's foundationally suspect conclusions regarding the 2014 observations with observations by the 2013 United of Omaha functional capacity examiner six months prior, with the effect that Zoltan's conclusion is based on a distortion of the factual evidence.

I) The 2013 functional capacity examination purchased by United of Omaha around the time of the September 2013 surveillance indicates that Mr. Fontana had difficulties with several activities that were interrupted due to pain, and that

Mr. Fontana was unable to complete testing. These observations were found by the FCE examiner to be consistent with the plaintiff's subjective complaints, including higher blood pressure confirming pain, and also with the examiner's observations as to how the plaintiff was performing the FCE test, indicating specifically that he was compensating for pain and not exaggerating; and that it was apparent from his report that soon after the functional capacity examination, the examiner was able to view the actual motion footage of the 2013 surveillance and thereby only noted some minor differences from the examination compared to the surveillance activity, concluding that the plaintiff could still only do sedentary work.

J) Zoltan's 2014 report on the other hand appears to conclude that the plaintiff should be able to perform his prior duties which Zoltan classifies as 'light duty', and that because the claim definition had already transitioned from "own-occupation" to "any occupation", it is unclear why Zoltan and United of Omaha were focused upon supposed discrepancies between the 2013 FCE and the 2013 surveillance, both of which implicated the "own occupation" time period, whereas the 2014 surveillance which depicted significantly less plaintiff-activity or suggestion of a sedentary capacity is the surveillance that is contemporary with Zoltan's 2014 examination.

K) It is apparent the records given by United of Omaha to Zoltan were older records from the time-period during which United of Omaha was paying benefits, and that some of those were records from a doctor who was no longer seeing the plaintiff.

L) United of Omaha's vocational consultant was presented primarily with Zoltan's report and a general job description that was inconsistent with the plaintiff's actual job description, and that primarily based upon these documents this vocational consultant concluded that the plaintiff could do his prior job,

14

which according to the Dictionary of Occupational Titles (DOT) code is considered 'light duty'.

M) This vocational consultant's conclusion that the plaintiff could do 'light duty' is primarily based upon Zoltan's report, which in turn was substantially based upon irrelevant or erroneous information such as the misrepresentation of the size of the plaintiff's dog and the outdated 2013 surveillance.

N) This vocational consultant did not interview the plaintiff nor request a job description from the plaintiff's employer, information which would likely have clarified that the plaintiff's job was classified at no less than the "medium" if not the "heavy" exertional category.

O) Upon information and belief United of Omaha's vocational consultant was not provided by United of Omaha with documents and/or information that United of Omaha's functional capacity vendor who conducted the September 2013 examination had concluded even after reviewing the surveillance motion footage that the plaintiff was still in the "sedentary" exertional category, and as a result the vocational vendor erroneously concluded that the plaintiff could do 'light duty'.

P) The plaintiff was awarded Social Security (deemed *below* sedentary exertional capacity) around the time of the first surveillance (September 3, 2013), which was at a time that United of Omaha acknowledged at least that the plaintiff had no more than a sedentary capacity; and that moreover the Social Security disability award was also contemporaneous with the subject Plan's transition from the 'Own Occupation'' to the Any Occupation' disability definition.

Q) With his February 2015 appeal the Plaintiff requested that in light of consultant Zoltan's suspect methodology and conclusions, it was evident that Zoltan and United of Omaha were operating pursuant to a conflict of interest, and thus that under current prevailing Ninth Circuit jurisprudence the plaintiff is

15

entitled to receive from United of Omaha information pertinent to any such conflict, such as statistics on how often consultant Zoltan was hired by United of Omaha and how often consultant Zoltan found claimants 'not disabled', because without this information the plaintiff could not assess the extent to which any such conflict of interest might have compromised the review process and decisions about his claim, and the denial of this information would thereby be a denial of the 'full and fair review' process mandated by ERISA provisions and the court decisions interpreting those provisions; United of Omaha failed to respond to this request.

XXXIII.

Despite Mr. Fontana's submission of these arguments, evidence and requests, and without turning over or otherwise even mentioning the surveillance motion footage that Plaintiff had now already requested three times, United of Omaha, on or about May 29, 2015, issued a "final" administrative denial of Mr. Fontana's LTD claim, alleging in pertinent part that the "*medical evidence does not support restrictions and/or limitations that would preclude Mr. Fontana from performing the material duties of his regular occupation from August 22, 2014 and ongoing*".

XXXIV.

As indicated in United of Omaha's May 29, 2015 final denial, United of Omaha retained to review Plaintiff's appeal evidence and arguments another peer ("paper") review consultant (William M. Strassberg, M.D.) from University Disability Consortium, who upon information and belief is another vendor specialized in providing disability reports for insurance companies; however United of Omaha did not ask or otherwise have United of Omaha's prior consultants respond to the plaintiff's questions and concerns regarding those consultants' methodologies and conclusions.

XXXV.

United of Omaha's retention of new consultant Strassberg during its appeal review followed by the issuance of United of Omaha's final denial on May 29, 2015 denied full and fair review to the plaintiff because with its final denial United of Omaha expressly stated its intent to close the administrative record to the input of further evidence, thereby denying the plaintiff an opportunity to submit evidence responsive to the conclusions of consultant Strassberg.

XXXVI.

United of Omaha's May 29, 2015 assertion that by retaining new consultant Strassberg United of Omaha had provided a full and fair review of the plaintiff's appeal is also false because United of Omaha still had not provided the surveillance motion footage that the plaintiff had repeatedly requested, nor clarified what knowledge or opinions, if any, its earlier consultants had of the surveillance, nor permitted the plaintiff's treating providers a chance to review the motion footage.

XXXVII.

United of Omaha's May 29, 2015 final denial also failed to address the plaintiff's stated appeal concerns regarding United of Omaha's vocational report, specifically that United of Omaha's vocational consultant failed to interview the plaintiff and instead based his conclusions primarily upon consultant Zoltan's foundationally suspect conclusions; and also that United of Omaha's vocational consultant was not provided with nor otherwise obtained a complete description of the plaintiff's job, a job which had greater exertional requirements than the vocational consultant acknowledged.

XXXVIII.

Consultant Strassberg declared in his report that he was critical of the examination by and the methods of Plaintiff's occupational capacity provider (Mary

Louis Hymen, MOT, OTR/L, FAOTA); however United of Omaha's stated intent of closing the record to new evidence via its May 29th denial denies full and fair review because it denies therapist Hymen an opportunity to respond to consultant Strassberg's criticisms.

XXXIX.

Consultant Strassberg's report also places into the record allegations about supposed drug non-compliance by the plaintiff and/or other drug issues, and thereby claims for the first time with its final denial that the plaintiff's credibility is thereby diminished, asserting in his report that he interpreted medical records to mean that the plaintiff wasn't taking his prescription medication correctly and was improperly taking medical-THC and also had a positive (November 2014) test for methamphetamine use; inferences and conclusions that United of Omaha relied upon in their final denial.

XL.

By asserting in its final denial that it intended to close the administrative record, United of Omaha denied full and fair review to the plaintiff by denying the plaintiff an opportunity to place the following responsive facts into the evidence: 1) that consultant Strassberg misconstrued a general prescription drug use warning he found in a consultative record as evidence that the plaintiff had violated the provider's prescription use policy; 2) that the plaintiff was discharged by his earlier pain management doctor for merely asking about medical-THC; 3) that the plaintiff's current pain management doctor did not object to the plaintiff incorporating medical-THC into his medication regimen, and that after only a few months the plaintiff discontinued THC use as he found it only minimally helpful; 4) the plaintiff has never used methamphetamine and his pain management doctor has in fact clarified that the evidence indicates the single November 2014 lab test is a "false positive".

XLI.

Because United of Omaha did not give the plaintiff and his doctors a chance to respond, United of Omaha's new denial-rationale (supposed drug infractions), effectively moved the 'goal-post' of what United of Omaha required the plaintiff to demonstrate in order to meet the requisite Plans' disability definition(s), and thereby United of Omaha has denied the plaintiff a full and fair review as contemplated by ERISA.  *See e.g., Sterio v. HM Life, 369 Fed. Appx. 801, 805 (9th Cir. 2010) (Tacking a new reason for the denial onto a final denial letter can be considered an abuse of discretion and a procedural violation, as it forecloses the insured from addressing the basis for the denial).*

XLII.

On or around June 3, 2014, a representative of United of Omaha contacted Plaintiff's counsel over the phone and advised that United of Omaha would be issuing a final denial of the plaintiff's claims, following which plaintiff through counsel issued on June 4, 2015 yet another written (fourth) request for the surveillance footage.  United of Omaha finally sent the surveillance footage along with a written copy of the final denial dated May 29, 2015, said mailing received by the plaintiff on or about June 6, 2015.

XLIII.

Consultant Strassberg either did not view the actual surveillance motion images or he substantially distorted what he did see; Strassberg's report declares that the March 17, 2014 surveillance shows that the plaintiff walked with ease and with fluid movements and/or drove uninterruptedly for 45 minutes and was able to enter and leave his car without any difficulty, whereas the actual images clearly depict the plaintiff moving slowly and with difficulty and do not depict a 45-minute drive.

XLIV.

United of Omaha's surveillance vendor declares in his report of the September 2013 surveillance that the plaintiff variously operated a vehicle, entered and exited his vehicle, carried a large trash bag and a box (unspecified as to size) to a dumpster, walked his dog, carried his dog, conversed, and moved his head and neck freely, and repeatedly bent at the waist; however the <u>actual</u> September 2013 motion footage shows 1) the plaintiff entering and exiting his vehicle with difficulty; 2) walking stiffly and with slow stride; 3) briefly carrying the small Pomeranian dog stiffly and with difficulty and with both arms, and; 4) slow and hesitant and stiff movements throughout the footage; and 5) that the referenced "box" is merely an empty plastic salad container that could not weigh more than 10 grams.

XLV.

Consultant Zoltan cites the surveillance vendor's September 2013 report for Zoltan's conclusion that the plaintiff can sustain full time work because the plaintiff supposedly had no difficulty throwing the referenced "box" and "bag" into the dumpster; yet the trash bag in the actual motion footage reveals the plaintiff to be swing-dragging the bag with obvious difficulty to the dumpster even though the bag does not appear from the footage to weigh more than 5 to 8 lbs and the footage also depicts the plaintiff making two attempts with difficulty to lift the bag into the dumpster.

XLVI.

It is further apparent from the actual September 2013 motion footage that the plaintiff only dragged one bag, not the multiple "bags" suggested by Zoltan's June 19, 2014 report.

XLVII.

Zoltan's June 2014 report declares that the surveillance depicts the

plaintiff bending over to carry the bag, however the actual September 2013 footage only depicts the plaintiff stiffly swing-dragging the bag and not discernibly bending.

XLVIII.

The actual motion footage from September 2013 confirms the dog is merely a toy-breed and yet that the plaintiff still had difficulty carrying it and placing it in the front seat of the SUV type vehicle, which was at <u>waist</u> level, and did not require the bending that Zoltan's report suggests took place.

XLIX.

Consultant Zoltan cites supposedly fluid neck movements on surveillance as a basis for his conclusion that the plaintiff could sustain full-time work, yet the plaintiff's chief claimed impairment is lower (lumbar) spine injuries; further the motion footage does not depict sudden or dramatic neck movements that contra-indicate the plaintiff's diagnoses and claimed limitations.

L.

The September 2013 surveillance report only states that the plaintiff was able to drive to and from his doctor appointment, but the actual motion footage shows a slow and stiff entering into and operation of the vehicle.

LI.

The September 2013 surveillance report also describes on another occasion the plaintiff exiting his apartment with his dog on his right arm and bending at the waist but the actual footage shows the plaintiff carrying the dog with a slow stride and no bending at the waist.

LII.

The surveillance vendor's written report of episodic footage over three days in March of 2014 describes only the plaintiff sitting and/or walking while talking on his cell phone and smoking on his patio and test-driving a vehicle for purchase;

but the actual motion footage shows the plaintiff walking and moving stiffly on his patio, and appearing to be in pain with both sitting and standing and walking, and that he is switching positions to relieve pain, moving slowly and bending only once and slightly at the waist while looking at the vehicle for sale.

LIII.

The surveillance vendor's written report of episodic footage over a couple of days in June of 2014 describes the plaintiff driving a vehicle into a remote area and/or suggests the plaintiff was driving for a total of 55 minutes whereas the actual motion footage only shows that the surveillance vendor lost track of the plaintiff's vehicle for most of the alleged 55 minutes.

LIV.

The June 2014 written surveillance report alleges that the plaintiff's girlfriend is observed acting in a "suspicious manner"; whereas the actual footage only depicts her talking on a cell-phone on the sidewalk in front of the plaintiff's apartment for a minute or so.

LV.

The June 2014 written surveillance report references only that the plaintiff drove to the defense medical (Zoltan's) examination that United of Omaha required him to attend but fails to acknowledge that the actual motion footage depicts the plaintiff walking like a much older person in a slow stride both to and from the examination building, which also contra-indicates Zoltan's report that an unnamed Zoltan employee allegedly saw the plaintiff walking through the exam building's parking lot without difficulty after the exam.

LVI.

Ultimately Defendant has substantially based its denials upon a gross distortion of surveillance footage by Defendant's surveillance vendor, distortions

which were in turn relied upon by medical and vocational vendors hired by United of Omaha whose reports were in turn relied upon by United of Omaha insurance adjusters; surveillance footage which United of Omaha throughout the entire claim and denial and appeal process concealed from the plaintiff despite the plaintiff's repeated requests for this footage at every key point of the claim chronology; footage which in actuality depicts only movements and observable limitations consistent with and supportive of the plaintiff's claimed impairments and treatment records to such a degree that the plaintiff could have himself cited in his appeal the subject surveillance footage as further evidence supportive of his claimed condition, restrictions and limitations.

LVII.

Since May 31, 2011, Anthony Fontana has been "totally disabled" as such terms are defined in the subject Plans, inclusive of any waiting periods and has remained under continuous medical care by physicians.

LVIII.

As a result of the issuance of the final May 29, 2015 denial, all administrative remedies have been exhausted, and this matter is ripe for judicial review.

LIX.

That the plaintiff requests the Court declare the rights and legal obligations of the parties and declare that the Long Term Disability Plan constitutes a binding and enforceable agreement. That the plaintiff prays for full relief for accumulated and accumulating monthly benefits and interest through the conclusion of litigation.

LX.

That this litigation is timely brought having followed within appropriate

and/or applicable time limitations the defendant's final denial and resultant exhaustion of administrative remedies, and is appropriate for a Federal District Court deciding Short Term and Long Term Disability issues per Section 502(a)(1)(B) of ERISA.

## Claim for Benefits Under ERISA

### LXI.

Defendant United of Omaha abused its discretion because its decisions denying the plaintiff's disability benefits were arbitrary and capricious and have no rational support in the evidence, and were caused or influenced by United of Omaha's consultants' financial conflicts of interest and also by United of Omaha's and/or the Plan(s)' own inherent financial conflict(s) of interest that arise from Policyholder SHC's grant of discretion to Defendant United of Omaha to determine eligibility for benefits and interpret all terms and provisions of the Policy.  These conflicts of interest have undermined the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. §2560.503-1(g)(1) and (h)(2).

### LXII.

Under the de novo standard or review, United of Omaha's decisions were erroneous, contrary to the Plan(s) terms, and contrary to the medical and vocational evidence.

### LXIII.

Upon information and belief, United of Omaha, the Plans, and the purportedly "independent" consultants Zoltan and Strassberg and United of Omaha's other consultants who evaluated the plaintiff's subject claim also suffer from financial conflicts of interest and bias all of which has precluded a full and fair review of the plaintiff's claim.

LXIV.

As a rationale for denying benefits, Defendant United of Omaha has improperly favored said hired-consultants' conclusions over the conclusions of treating physicians; specifically that in reaching their conclusions, defendant United of Omaha's physician consultants failed to consider all of the plaintiff's signs, symptoms, impairments and limitations.

LXV.

That the defendant's consultants' opinions are so conclusory, unsubstantiated and against the weight of the evidence as to indicate that said consultants were improperly influenced by United of Omaha to support a benefits denial and/or that said consultants had a financial interest in supporting the claim denial in order to ensure repeat business, which infected the claims process and constitutes a procedural irregularity under ERISA that denied the plaintiff the full and fair review to which he is entitled.

LXVI.

That the plaintiff is entitled to discovery regarding the effects of the procedural irregularities evidencing conflicts of interest that occurred during the claims handling process and also regarding the effects of United of Omaha's consultants and United of Omaha's and/or the subject Plan's financial conflicts of interest upon the claim denials.

LXVII.

The defendant's misrepresentation of the contents of surveillance footage while at the same time denying Plaintiff's repeated requests to view the footage; and also the defendant's reliance in pertinent part for its final claim denial upon Defendant's newly presented medical opinions and theories, substantially refutable by Plaintiff if not denied the chance, are all present procedural irregularities

of such significance that the District Court may consider evidence outside the administrative record in order to fully develop the administrative record. *Aluisi v. Elliott Mfg. Co. Inc., 672 F. Supp. 2d, 1068, 1082 (E.D. Calif, 2009); Burke v. Pitney Bowes Inc. LTD Plan, 544 F.3d 1016, 1028 (9th Cir. 2008); Abatie v. Alta Health & Life Inc. Co. 458 F.3d, 955, 972-73 (9th Cir. 2006)*

LXVIII.

In light of the procedural irregularities and authority referenced in preceding paragraph LXVII, Plaintiff attaches to this Complaint the following additional evidence responsive to the issues newly raised by Defendant's final May 29, 2015 denial and by Defendant's withholding of the surveillance motion footage:

1) Exhibit A:  August 25, 2015 opinion of Plaintiff's occupational therapist (Mary Louise Hymen , MOT, OTR/L) regarding the contents of surveillance motion-footage and also her testing methodology; and

2) Exhibit B:  June 29, 2015 correspondence from Aaron Rodarte PA-C of Arizona CPR, Plaintiff's treating pain-management provider, clarifying that the laboratory test cited by consultant Strassberg as evidence of supposed illicit drug use by Plaintiff reflects merely a false positive for the alleged illicit substance; and

3) Exhibit C:   September 15, 2015 correspondence from Plaintiff Anthony Fontana attesting that he has not and does not use illegal drugs.

4) Exhibit D:   October 7, 2015 toxicology screening from HealthCore Labs LLC, reflecting negative for illicit and/or illegal substances.

LXIX.

That the plaintiff has been injured and has suffered damages in the form of lost LTD benefits as a result of the defendant's wrongful actions and decision to deny the plaintiff disability benefits.

LXX.

Pursuant to ERISA, 29 U.S.C. § 1132, the plaintiff is entitled to recover unpaid disability benefits, prejudgment interest, reasonable attorney's fees, and costs from Defendant and/or is entitled to an order enforcing his right to disability benefits under the subject LTD plan.

LXXI.

As a direct and proximate result thereof, based upon the evidence submitted by Plaintiff to Defendant establishing that Plaintiff has met the LTD Plan's requisite disability definitions continuously since May 31, 2011, Plaintiff is entitled to his monthly disability insurance payments retroactive to the subject denial date of August 28, 2014.

LXXII.

The plaintiff has further been injured and suffered damages by losing other benefits to which he may have been entitled under his employer's ERISA-governed benefits plans.

LXXIII.

Upon information and belief, that Group Control Number GUD-09P58 also contains a waiver of premium benefit on certain life insurance benefits and policies to which the plaintiff is entitled if disabled as alleged in the causes of action heretofore, and that in connection with the denial of the subject LTD benefits, the plaintiff was notified that he no longer met eligibility requirements for said premium waiver and therefore has already lost or soon will lose the substantial ERISA benefit of said life insurance policies.

LXXIV.

That the Defendant, United of Omaha, the Plans and Employer SHC, stand as fiduciaries to one another and to the plaintiff, and each has the power to

bind the other, as agent.

LXXV.

That the actions of Defendant are a breach of contractual and/or fiduciary duties inuring to the subject Plan pursuant to the requirements of 29 U.S.C. §502(a)(1)(B).

LXXVI.

That the defendant's actions are an unwarranted breach of the subject Long Term Disability Plan, representations by Plan(s)' documents, ERISA, and the contract(s) of insurance, and have caused and continue to cause the plaintiff great financial hardship. That the plaintiff meets the subject and requisite disability definition(s) and provisions of his "own" and/or "any" occupation policy provisions of the subject LTD Plan, with special essential duties and hourly provisions.

LXXVII.

That the plaintiff's damages are at least $41,773.62 to date and accumulating, currently calculated under the subject Plan as $5,182.73 (66.67% of a $7,773.70 gross monthly salary) offset by the monthly Social Security Disability benefits of $2,198.90 per month, leaving a net LTD monthly benefit of $2,983.83, multiplied by the approximate 14 months elapsed thus far since August 28, 2014, the date after which the defendant United of Omaha denied further benefit payments.

WHEREFORE, the Plaintiff prays judgment as follows:

A. For a judgment for benefits and an Order such benefits continue, per ERISA, including 29 U.S.C. § 1132(g)(2).

B. For $2,983.93 per month for LTD benefits from August 28, 2014 and ongoing, through judgment and post-judgment as appropriate, and all monthly payments and

28

accumulated interest due from day of judgment.

C. For declaratory judgment granting Plaintiff all rights and benefits under the written Policies/Plans, and to award the plaintiff a money judgment for all sums due and owing with interest from time of breach; and/or an order enforcing the plaintiff's right to benefits under the subject Plans;

D. For all other damages as may be just and proper under Arizona State law or developing ERISA and/or other Federal case and statutory law.

E. For attorney fees, pursuant to ERISA, see 29 USC § 1132(g)(1).

F. For appropriate relief under 29 USC § 502(a)(1)(B), to redress such violations, or to enforce any provision of this title or the terms of the Plans.

G. For reimbursement for any funds paid by Plaintiff or due the plaintiff for the continuation of life insurance policies as an employee benefit dependent upon STD//LTD-eligibility on behalf of the plaintiff and any dependents, and, in the eventuality of death during the pendency of this litigation, to full payment on all policies to the named beneficiaries.

H. For costs and disbursements of this action and interest on all sums owed until payment.


DATED this 26th day of October 2015

THE LAW OFFICE OF PAUL J. DOMBECK, PLLC


By  s/  Paul J. Dombeck

PAUL J. DOMBECK, ESQ.
18444 North 25th Avenue, Ste 420
Phoenix, Arizona  85023
Attorney for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of October, 2015, I electronically transmitted the attached documents to the Court Clerk's Office using the CM/ECF System for filing and transmittal of a Parties' Civil Coversheet, Summons and Complaint, and Exhibits.


s/ Paul J. Dombeck

_____

Paul J. Dombeck